**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**ELIZABETH CHADER,**

               **Plaintiff,**                **1:07-cv-1212**
                                                              **(GLS\DRH)**

       v.

**CSX TRANSPORTATION, INC.,**

               **Defendant.**
_____

| **APPEARANCES:** | **OF COUNSEL:** |
|---|---|
| **FOR THE PLAINTIFF:** | |
| Moody, Strople Law Firm<br>P.O. Box 1138<br>500 Crawford Street<br>Suite 300<br>Portsmouth, VA 23705-1138 | CLAUDE W. ANDERSON, JR., ESQ. |
| Hacker, Murphy Law Firm<br>7 Airport Park Boulevard<br>Latham, NY 12110-0104 | JAMES E. HACKER, ESQ.<br>THOMAS D. BUCHANAN, ESQ. |
| **FOR THE DEFENDANT:** | |
| McNamee, Lochner Law Firm<br>677 Broadway<br>Albany, NY 12207-2503 | SCOTT A. BARBOUR, ESQ. |

**Gary L. Sharpe**
**U.S. District Judge**

**MEMORANDUM-DECISION AND ORDER**

## I. Introduction

Plaintiff Elizabeth Chader brought this action against her employer, CSX Corporation, Inc., under the Federal Employers' Liability Act (FELA),[1] alleging CSX's liability for injuries she sustained in her right hand during the course of her employment.  (*See generally* Compl., Dkt. No. 1.)  Pending is CSX's motion for summary judgment.  (Dkt. No. 15.)  For the reasons that follow, the motion is denied.

## II. Background

### A. Facts

From August 2000 to present, Chader has been employed by CSX. (*See* Pl. Mem. of Law at 2, Dkt. No. 16.)  On March 14, 2005, in Selkirk, New York, Chader was working for CSX as a stevedore.  (*See* Compl. ¶ 6, Dkt. No. 1; *see also* Def. SMF ¶ 2, Dkt. No. 15:15.)  As a stevedore, Chader unloaded automobiles from railcars.  (*See* Def. SMF ¶ 4, Dkt. No. 15:15.)  Specifically, Chader was required to (1) open the railcar doors, (2) place metal plates between the railcars, (3) unshackle the automobiles located within the railcars, and (4) drive the automobiles to designated

---

[1] 45 U.S.C. § 51, *et. seq.*

2

parking spaces.  (*See* Def. SMF ¶ 4-5, Dkt. No. 15:15.)

On March 14, 2005, Chader was unloading automobiles that were shackled to the railcars by "grate chocks."  (*See id.* at ¶ 6.)  Chocks are metal-plastic devices that are clamped to the railcar floor in front of or behind an automobile's wheels to hold the automobile in place during rail transport.  (*See* Def. Mem. of Law at 2, Dkt. No. 15:14 (citing Def. Ex. C, Chader Dep. at 41, Dkt. No. 15:5).)  Chader removes grate chocks in three steps.  First, she rotates a lever on the chock to loosen the chock from the grating on the railcar floor.  (*See* Def. SMF ¶ 7, Dkt. No. 15:15.)  Second, Chader collapses the chock, which reduces its size.  (*See id.*)  Third, she places the collapsed chock on a bracket on the railcar's wall for storage and secures the chock to the bracket by rotating the lever on the chock. (*See id.*)  Chader performs this process "[o]ne chock at a time."  (*See* Def. Ex. C, Chader Dep. at 72, Dkt. No. 15:6.)

On March 14, while removing a grate chock, Chader was injured.[2]  (*See* Def. SMF ¶ , Dkt. No. 15:15.)  At that time, Chader was handling a

---

[2]Prior to this injury, Chader had removed approximately two-thirds to three-quarters of the grate chocks she was responsible for.  (*See* Def. SMF ¶ 8, Dkt. No. 15:15.)  Up to this point, Chader had not made any complaints to her supervisors regarding the condition of the chocks.  (*See* Def. SMF ¶ 8, Dkt. No. 15:15.)

3

chock that weighed approximately five to ten pounds. (*See* Def. Ex. C, Chader Dep. at 90, Dkt. No. 15:6.) She had already removed the chock from the railcar floor grate and was not operating the lever on the chock. (*See* Def. SMF ¶¶ 10-11, Dkt. No. 15:15; *see also* Def. Ex. C, Chader Dep. at 78, 80, Dkt. No. 15:6).) However, the specific cause of her injury is in dispute. In other words, it is unclear where in the process of handling the chock Chader suffered her injury.

Chader filed an Employee Incident Report on April 8, 2005. (*See* Def. Ex. F, Dkt. No. 15:9.) In the Report, Chader described the incident as follows: "[p]lacing chock on wall I felt a stabbing pain in my wrist [and] was unable to use my hand after this." (*See id.* at 1.) In filing the Report, Chader responded "no" to the questions asking whether the injury was a recurrence, whether anyone was at fault, whether defective tools or equipment caused the incident, and whether there was any failure to give usual or necessary signals, warnings, or protection. (*See id.* at 1-2.) Additionally, Chader responded "yes" to a question asking whether she had a safe place to work in. (*See id.* at 2.)

**B.   Procedural History**

Chader filed suit against CSX on November 15, 2007, pursuant to

FELA, claiming CSX: (1) failed to provide a reasonably safe place to work; (2) failed to provide Chader with safe and proper tools for performing her duties; (3) failed to provide Chader with sufficient time to perform her duties; (4) failed to take appropriate precautions for Chader; (5) assigned work to Chader that she was not properly trained or physically suited to perform under the conditions at the time of the alleged incident; (6) failed to provide reasonable or adequate assistance and supervision; and (7) failed to promulgate and enforce rules, regulations, policies, or procedures for employees to perform their duties safely and properly.  (*See* Compl. at ¶ 8, Dkt. No. 1.)  In addition, Chader alleged that CSX and its agents, supervisory personnel, and other employees negligently caused her injuries.  (*See id.*)  Consequently, Chader demanded $400,000 in damages for: (1) injuries to her right hand; (2) past and future physical pain, discomfort, and mental anguish; (3) past and future medical expenses; (4) lost income, earning capacity, and employment benefits; and (5) lost ability to perform "the usual personal affairs of a woman of her age and position in life."  (*See id.* at ¶ 11.)

On February 2, 2009, CSX moved for summary judgment on Chader's claims.  (*See* Def. Mem. of Law at 10-13, Dkt. No. 15:14.)

5

Specifically, CSX contends that, based on all the evidence, Chader failed to demonstrate proximate cause and reasonable foreseeability. (*See id.*)

### III. Standards of Review

**A.   Summary Judgment**

The standard for the grant of summary judgment is well-established, and will not be repeated here. For a full discussion of the standard, the court refers the parties to its previous opinion in *Bain v. Town of Argyle*, 499 F. Supp.2d 192, 194-95 (N.D.N.Y. 2007).

**B.   Federal Employers' Liability Act**

FELA is a broad remedial statute that must be construed liberally in order to effectuate its purposes. *Marchica v. Long Island R.R. Co.*, 31 F.3d 1197 (2d Cir.1994). Under FELA, a railroad engaged in interstate commerce is liable to "any person suffering injury while [she] is employed by [the railroad] ... for such injury ... resulting in whole or in part from the negligence of any of [its] officers, agents, or employees." 45 U.S.C. § 51.

The Second Circuit "construes the statute, in light of its broad remedial nature, as creating a relaxed standard for negligence as well as causation." *Williams v. Long Island R.R. Co.*, 196 F.3d 402, 406 (2d Cir. 1999) (internal quotation marks and citation omitted). However,"FELA is

6

not a strict liability statute, and the fact that an employee is injured is not proof of negligence." *Id.* (internal quotation marks and citations omitted). "FELA does not make the employer the insurer of the safety of his employees while they are on duty. The basis of his liability is his negligence, not the fact that injuries occur." *Capriotti v. Consol. Rail Corp.*, 878 F. Supp. 429, 431 (N.D.N.Y. 1995) (internal quotation marks and citation omitted). Accordingly, "the traditional common law negligence elements of duty, breach, causation and damages are still applicable." *Id.* (citation omitted).

FELA requires an employer "to provide its employees with a reasonably safe place to work and this includes the duty to maintain and inspect work areas." *Sinclair v. Long Island R.R.*, 985 F.2d 74, 76 (2d Cir. 1993) (citations omitted). "An employer breaches its duty to provide a safe workplace when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees."[3]  *Gallose v. Long Island R.R.*, 878 F.2d 80, 84-85 (2d Cir.1989) (citations omitted); *see also Tufariello v. Long Island R.R. Co.*,

---

[3]"[W]hether the railroad used reasonable care in furnishing its employees a safe place to work is normally a question for the jury." *Sinclair*, 985 F.2d at 77 (quotation marks and citation omitted).

7

458 F.3d 80, 87 (2d Cir. 2006).

"[R]easonable foreseeability of harm is an essential ingredient of [FELA] negligence." *Gallick v. Baltimore and Ohio R.R. Co.*, 372 U.S. 108, 117 (1963) (citations omitted). Under FELA, the reasonable foreseeability element "requires proof of actual or constructive notice to the employer of the defective condition that caused the injury."[4] *Sinclair*, 985 F.2d at 77.

In evaluating causation, the question is "whether the proofs justify with reason the conclusion that e[m]ployer negligence played any part, even the slightest, in producing the injury ... for which damages are sought." *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 506 (1957); *see also Marchica*, 31 F.3d at 1207 ("[T]he traditional concept of proximate cause is supplanted by the less stringent standard that there be some causal relation, no matter how slight, between the injury and the railroad's breach of duty.") (citing *Gallick*, 372 U.S. at 116). These are factual issues and "[a]s with all factual issues under the FELA, the right of the jury to pass on [them] must be liberally construed." *Gallose*, 878 F.2d at 84-85.

"[T]he Second Circuit has placed a particularly heavy burden on

---

[4] Whether an employer had notice typically presents a question of fact. *See Paul v. Genesee & Wyo. Indus., Inc.*, 93 F. Supp.2d 310, 318 (W.D.N.Y. 2000).

8

parties seeking summary judgment on FELA claims." *Wahlstrom v. Metro-North Commuter R.R. Co.*, 89 F. Supp.2d 506, 514 (S.D.N.Y. 2000). Thus, "[u]nder the FELA, 'the case must not be dismissed at the summary judgment phase unless there is absolutely no reasonable basis for a jury to find for the plaintiff.'" *Gadsden v. Port Auth. Trans-Hudson Corp.*, 140 F.3d 207, 209 (2d Cir.1998) (quoting *Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 828 (2d Cir.1994)).

## IV.  Discussion

Based on the pleadings, affidavits, and evidence submitted, genuine issues of material fact remain regarding CSX's negligence under FELA. *See* FED. R. CIV. P. 56(c)(2); *see also Bain*, 499 F. Supp.2d at 194-95.

Chader's deposition testimony is unclear and, at times, inconsistent. CSX argues that causation is absent because "this incident occurred as [Chader] was going to put the chock on the wall," and therefore the functioning of the chock is immaterial.  (*See* Def. SMF ¶ 18, Dkt. No. 15:15.)  Specifically, CSX asserts that the injury occurred "*after* completing the collapsing but before [getting] it to the wall."  (*See* Def. Ex. C, Chader Dep. at 78, Dkt. No. 15:6 (emphasis added); *see also* Def. SMF ¶ 10, Dkt.

9

No. 15:15; Pl. SMF ¶ 10, Dkt. No. 17.)  Chader's testimony at times seems clear: "[I g]o to put it on the wall, I'm screaming."  (*Id.* at 75-76.)  CSX highlights that, as Chader was placing the chock on the wall, she "felt a stabbing pain in [her] wrist and was unable to use [her] hand after this."  (Def. SMF ¶12, Dkt. No. 15:15 (citing Def. Ex. F, Employee Incident Report completed by Chader, Dkt. No. 15:9); *see also id.* at ¶14 (citing Def. Ex. G, Chader Witness/Injured Party Statement, Dkt. No. 15:10); *id.* at ¶16 (citing Def. Ex. I, June 16, 2005 Chader Medical History Form, Dkt. No. 15:12); Def. Ex. H, June 3, 2005 Chader Taped Statement at 3, Dkt. No. 15:11 ("I went to put it on the wall and when I twisted my wrist just to put it up to the wall it felt like somebody stuck an ice pick right through my wrist.").)

However, in reviewing the deposition testimony, it is not clear whether some of the statements CSX relies on were made by Chader generally or specifically to the incident in question.  For instance, Chader testified to "collaps[ing] the chock against [her] stomach" by "pull[ing] out on the tension and push[ing]."  (Def. Ex. C, Chader Dep. at 77, Dkt. No. 15:6.)  But it is unclear whether she was speaking generally or specifically.

Moreover, there are times in Chader's deposition that the testimony upon which CSX relies is contradicted.  Chader raises questions as to

10

when and where in the process of removing the grate chock her injury occurred.  Chader points to statements that her injury occurred somewhere "*between*" collapsing the chock and bringing it to the wall.  (*See* Def. Ex. C, Chader Dep. at 76, Dkt. No. 15:6 (emphasis added); *see also id.* at 74-75 ("I was somewhere between picking [the chock] up off the floor, collapsing the chock and going to the wall.").)  Chader describes the process of collapsing the chock and securing it to the wall as a "flow" of "constant" or "fluid movement."  (*See id.* at 74, 76; *see also* Pl. SMF ¶¶ 17, 25, 28, Dkt. No. 17.)  Chader stresses that it "took seconds from between the time she loosened the chock off the floor until the time she felt the pain."  (Pl. SMF ¶34, Dkt. No. 17 (citing Def. Ex. C, Chader Dep. at 89, Dkt. No. 15:6).)

Furthermore, the parties dispute what, if any, effect the weather conditions had on the incident and the functioning of the chock. According to CSX, "the operation of the chock and the cold weather conditions played no role in the happening of this incident."  (*See* Def. SMF ¶ 18, Dkt. No. 15:15.)  But Chader argues that on March 14 the chocks were significantly affected by the cold weather.  Specifically, she claims the chocks "were frozen," which made them "very difficult ... to loosen up from the grates." (Def. Ex. C, Chader Dep. at 69, Dkt. No. 15:5; *see also* Pl. SMF ¶ 18, 22,

11

Dkt. No. 17.)  Besides being difficult to remove from the grate, Chader contends that the specific chock was "stiff in collapsing."  (*See id.* at 80-81; *see also* Pl. SMF ¶ 33, Dkt. No. 17).  Chader explains that the effect of the cold weather on the chocks was a "normal occurrence."  (Def. Ex. C, Chader Dep. at 70, Dkt. No. 15:5.)  Although she did not make a complaint to a supervisor on March 14 prior to the incident, (*see id.*; *see also* Def. SMF ¶ 8, Dkt. No. 15:15), Chader recounts that, before March 14, she notified CSX management of the condition and performance of the grate chocks in cold weather, (*see* Pl. SMF ¶ 19, Dkt. No. 17 (citing Def. Ex. C, Chader Dep. at 70, Dkt. No. 15:5)).  Chader also asserts that CSX was aware that the railcars and the chocks were subjected to freezing temperatures.[5]  (*See* Def. Ex. J, Pl. Interrog. at 11, Dkt. No. 15:13.)

   Based on the above disputed facts, CSX has failed to show "there is absolutely no reasonable basis for a jury to find for the plaintiff."  *Gadsden*, 140 F.3d at 209 (internal quotation marks and citation omitted).  Though

---

[5]Although Chader discussed in general how chocks can be defective or break in cold weather, CSX points out that nothing in the record establishes that the particular chock she was handling at the time of injury was broken.  (*See* Def. Reply Mem. of Law at 5, Dkt. No. 18:2; *but see* Pl. SMF ¶ 17, Dkt. No. 17.)  And although the plastic components of chocks had a tendency to snap in freezing conditions, the plastic was in tact on the chock Chader was handling.  (*See* Pl. SMF ¶ 31, Dkt. No. 17; *see also* Def. Ex. C, Chader Dep. at 79, Dkt. No. 15:6).

12

certain evidence may seem conclusive when viewed in isolation, the record viewed in its totality reveals questions of material fact. Thus, with regards to whether CSX proximately caused Chader's alleged injuries and whether Chader's injuries were reasonably foreseeable, CSX fails to meet FELA's "particularly heavy burden" for summary judgment. *See Wahlstrom*, 89 F. Supp.2d at 514. Accordingly, the court denies CSX's motion for summary judgment.

### V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that CSX's motion for summary judgment (Dkt. No. 15) is **DENIED**; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

September 30, 2009
Albany, New York

_____
United States District Court Judge